Timothy C. GANTT, Petitioner–
Appellant,

v.

Ernie C. ROE;  Attorney General
of the State of California,
Respondents–Appellees.

No.  99–55477.

United States Court of Appeals,
Ninth Circuit.

Submitted Jan. 16, 2003.*

Submission Deferred Jan. 17, 2003.

Resubmitted Nov. 24, 2003.

Filed Nov. 22, 2004.

* This panel unanimously finds this case suit-
able for decision without oral argument.  See

Fed. R.App. P. 34(a)(2).

Gerson Simon, Los Angeles, CA, for the petitioner.

Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Alan D. Tate, Deputy Attorney General, Los Angeles, CA, for the respondent.

Before: HALL, KOZINSKI and RAWLINSON, Circuit Judges.

KOZINSKI, Circuit Judge.

Petitioner was convicted of murder and robbery in state court and sentenced to life in prison without possibility of parole. In his federal habeas petition he raises a number of claims, the most significant of which is that the prosecution failed to disclose exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## Facts

The victim, Kalpesh Vardham, was found dead on the sixth level of a parking garage in downtown Los Angeles, having been stabbed 19 times during an apparent robbery. E.R. 19–20. No suspects were found at the scene when police arrived.

Two months later, the police picked up David Rosemond, a local car burglar, in connection with an unrelated burglary. Rosemond disclosed that he had been in the garage at the time of Vardham's murder and had seen petitioner "beating up" the victim. E.R. 23–25, R.T. 260. After getting Rosemond's tip, the police arrested petitioner and questioned him about the crime. E.R. 25. They found that he was carrying a matchbook from Shalimar, an Indian restaurant in the Los Angeles area. Written inside the matchbook was a 19-digit phone number, which turned out to connect to a phone in Bangladesh. R.T. 381. Petitioner explained that the phone number had been given to him by someone he called "Mohamad." LAPD Statement Form (Oct. 22, 1992), *in* Trav., Exh. J; LAPD Follow-up Investigation Form at 3 (Oct. 29, 1992), *in* Trav., Exh. M. The police released petitioner but rearrested him almost a year later. He was tried for murder and robbery.

The key issue at trial was identity. Rosemond testified consistently with his statement to the police. The only other eyewitnesses were a CPA named Kevin Shorts who parked on the sixth level of the structure about the time of the crime and said he saw petitioner together with one Michael Smith,[1] E.R. 20–22, and a parking lot attendant who specially marked the tickets of those who didn't have to pay because they were in the parking lot for less than five minutes or so. R.T. 225. The attendant remembered that the only

---

1. Petitioner and Smith were tried together. Rosemond testified that he saw Smith holding a gun while petitioner was beating up the victim. R.T. 238–39.

no-pay that day belonged to a car that had entered at 9:08 a.m. and left at 9:13 a.m.,[2] driven by a black man between 35 and 40 years old and weighing about 200 pounds (a description that fit petitioner, who was 46 years old at the time, reasonably well), with a similarly built passenger. R.T. 227, 231–32; see LAPD Follow-up Investigation Form at 1 (Oct. 29, 1992), in Trav., Exh. M.

The only physical evidence that could link petitioner to the crime was the matchbook with the phone number written inside. The prosecution tried to prove that petitioner and Smith set out to rob Vardham, and that the robbery had turned into a murder; that Vardham had the matchbook on him at the time of the crime; and that petitioner lifted it, along with a wallet (which the prosecution did not produce), from Vardham's body shortly after stabbing him. There was no evidence that the matchbook had traces of blood on it, and no one claimed to have seen the matchbook in Vardham's possession. It was the prosecution's theory that someone had given Vardham the phone number and, having nothing better to write it on, Vardham used the matchbook. The prosecution's handwriting expert testified that there were "good indications" the victim "possibly wrote the numerical notations, particularly the numbers 88031227034." R.T. 327.

What the prosecution did not show, because it could not, was any connection between the victim and the phone number. The police had called the number and spoken to a man in Bangladesh, who said he did not recognize Vardham's name. R.T.

381–82. This fact was disclosed to the defense before trial. R.T. 101. The police had also faxed a photograph of the victim to authorities in Bangladesh, who showed it to the proprietor of the house to which the phone number connected, a man named Khan. Khan did not recognize the face in the photograph. The police knew about this by the last day of testimony; the prosecutor disclosed Khan's meeting with the Bangladeshi authorities to the defense but did not mention that Khan had not recognized Vardham's face. See LAPD Investigator's Report (Mar. 28, 1994), in Trav., Exh. H ("[On March 2,] Mr. Khan told Commissioner Khan that he could not recognize the person depicted in the fax photograph.... Deputy District Attorney Norris [the prosecutor] was advised of the above information."); R.T. 390–91.[3]

In the same meeting with Bangladeshi authorities, Khan mentioned that he had a son named Ferdous Khan who lived in Los Angeles and worked, of all places, at the Shalimar restaurant. Khan suggested that his son might know the victim. In the disclosure to the defense, the prosecutor mentioned the existence of Khan's son, R.T. 391, but not that the police had already met with Ferdous several days before trial—apparently unaware that he was Khan's son—and that Ferdous hadn't recognized Vardham's face from a photograph. LAPD Investigator's Report (Mar. 28, 1994), in Trav., Exh. H ("[On February 23, Ferdous] ... could not identify the photograph of the victim. Deputy District

---

**2.** The ticket, with the time-stamps and the notation "N.P." ("no pay"), was introduced into evidence. R.T. 226–29.

**3.** It is unclear whether the prosecutor omitted this information on purpose, because he forgot, or because he knew only some of the results of the Bangladeshi investigation at that time. But it is clear that the police knew

about the photograph by the last day of testimony, and the prosecution is charged with knowledge of the information held by its investigating agents. See United States v. Zuno–Arce, 44 F.3d 1420, 1427 (9th Cir.1995); United States v. Bryan, 868 F.2d 1032, 1036 (9th Cir.1989).

Attorney Norris was advised of the above information."). In fact, the prosecutor affirmatively represented the opposite— "[W]e have not been able to converse with the son"—as he claimed he was "keep[ing] counsel apprised of the ongoing investigation in this case." R.T. 390–91; *see also* R.T. 101. Petitioner claims that the defense didn't learn of the meeting with Ferdous until over a year after the trial, when it saw a police report that documented the full extent of the investigation. Trav. at 45.[4]

Petitioner was convicted of murder and robbery and, having exhausted his state remedies, brought this habeas petition.[5]

## Discussion

■ **1.** It has been well established since long before petitioner's conviction became final in 1996 that the prosecution in a criminal case has a duty to disclose all material evidence in its possession that is favorable to the accused. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Blackmun, J.); *id.* at 685, 105 S.Ct. 3375 (White, J., concurring in part and concurring in the judgment); *see also United States v. Shaffer*, 789 F.2d 682, 687–88 (9th Cir.1986). And the prosecution here had evidence concerning the matchbook that it apparently failed to disclose. To grasp the significance of this evidence, one must understand the prosecution's theory of the case.

According to the prosecution, petitioner had the matchbook because he took it from Vardham. And Vardham, in turn, had it because he had used it as a scratch-pad: Someone gave him a number too long to remember, so he wrote it on the matchbook.

But how did Vardham come to have the number of a man in Bangladesh who didn't know him? Obviously, he must have gotten it from someone who knew the number—the most likely such person being Khan's son, Ferdous, who worked at the Shalimar restaurant, where matchbooks with the Shalimar logo would be readily available.[6] Thus, for the prosecution's theory to work, Vardham must have spoken to Ferdous, probably at the Shalimar restaurant, and Ferdous must have given him his father's number—which Vardham must then have written on a matchbook he picked up for that purpose. This is by far the most likely scenario, consistent with the prosecution's theory, of why Vardham would have had a Shalimar matchbook with Khan's number hand-written in it.

That Ferdous didn't know Vardham undercuts this theory: It is not likely that Ferdous would have forgotten someone to whom he gave his father's phone number. The person seeking Khan's number must have offered some legitimate reason, and

---

4. The state does not admit, nor has any court found, that the prosecution failed to disclose that Khan and Ferdous did not recognize Vardham's face from the photograph. The district court below, in addressing petitioner's *Brady* claim, held that any discovery violation was harmless. In discussing petitioner's claim, we assume these facts were not disclosed. *But see* page 916 *infra* (remanding for resolution of this possible factual dispute).

5. This is petitioner's second federal habeas petition. His first petition was dismissed without prejudice. We granted a certificate of appealability with respect to (1) the timeliness of the current habeas petition, (2) whether petitioner was deprived of a fair trial by prosecutorial misconduct, and (3) whether petitioner's trial counsel was ineffective. E.R. 106. The parties now agree that the petition was timely. *See* Appellant's Br. at 11–13 (filed July 11, 2003); Appellee's Br. at 14–19 (filed Aug. 11, 2003).

6. Vardham was not a smoker, R.T. 127, so he was unlikely to have been carrying the matchbook on him prior to writing the number in it.

Ferdous must have been sufficiently comfortable with the recipient to feel secure that no mischief would come of giving it to him; one generally doesn't hand a family member's home telephone number to random strangers. If Ferdous didn't recognize Vardham, this means that Ferdous didn't give him the number, and so Vardham was probably never in a position to write the number on the matchbook. And, if Vardham didn't write the number in the matchbook, there is no reason to believe that petitioner found the matchbook in Vardham's pocket.

That Khan didn't recognize Vardham's picture when it was shown to him by Bangladeshi authorities could also have been helpful to the defense. After all, the jury could have reasoned that, though the man in Bangladesh didn't remember the victim's name, he nevertheless might know him by sight. Evidence to the contrary could have helped persuade the jury that there really was no connection between Vardham and the person whose number was written in the matchbook—and therefore that the matchbook didn't come from Vardham at all.

■■■ *Brady* is not confined to evidence that affirmatively proves a defendant innocent: Even if evidence is merely "favorable to the accused," its suppression violates *Brady* if prejudice results. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The evidence the prosecution failed to disclose here surely satisfies the low "favorable to the accused" standard. That these pieces of information were found (or their relevance discovered) only in time for the last day of testimony underscores that disclosure should have been *immediate:* Disclo-

sure must be made "at a time when [it] would be of value to the accused." *United States v. Davenport,* 753 F.2d 1460, 1462 (9th Cir.1985). The prosecutor may have been so busy preparing to wrap up his case that he failed to connect Khan's revelation about his son with the previous interview with Ferdous, or failed to grasp the significance of the fact that Khan didn't recognize the face in the photograph. But *Brady* has no good faith or inadvertence defense. *Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *cf. United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it." (footnote omitted)); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.").

Even a prompt disclosure after the verdict would have been useful in supporting defendant's motion for a new trial, which was argued a few months later and focused on the matchbook evidence. R.T. 571–75. As it was, these facts seem to have lain dormant until petitioner's appellate counsel found the investigator's reports a year later. Trav. at 45.

■■ 2. The district court concluded that the evidence was not "suppressed" within the meaning of *Brady,* because the defense could and should have discovered it itself.[7] E.R. 63. While the defense

---

**7.** The district court is the only court to have addressed the merits of petitioner's *Brady*

claim. The California Court of Appeal affirmed petitioner's conviction without being

could have been more diligent—and, indeed, the defense lawyer's failure to investigate the phone number himself is part of petitioner's ineffective assistance of counsel claim—this does not absolve the prosecution of its *Brady* responsibilities. As the Supreme Court reiterated just last Term, "[a] rule ... declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke,* 540 U.S. 668, 124 S.Ct. 1256, 1275, 157 L.Ed.2d 1166 (2004). Petitioner's case presents an even stronger argument for disclosure than does *Banks,* because defense counsel here relied not merely on the force of *Brady* itself, but also—as with the prosecution's claimed "open file" policy in *Strickler,* 527 U.S. at 276 n. 13, 119 S.Ct. 1936—on affirmative representations by the prosecution that it was keeping the defense apprised of developments in the investigation. Though defense counsel could have conducted his own investigation, he was surely entitled to rely on the prosecution's representation that it was sharing the fruits of the police investigation.

■ 3. Showing that the prosecution failed to disclose exculpatory evidence is *not enough to entitle petitioner to habeas relief;* he must also show that he suffered prejudice—that is, that there is a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed. *Strickler,* 527 U.S. at 281–82, 119 S.Ct. 1936. To this inquiry we now turn.

■ The state's case against petitioner was relatively weak. Putting aside the matchbook evidence, three witnesses tied petitioner to the crime. The first was Kevin Shorts, the CPA, who testified only that he saw petitioner and Smith near the scene of the crime around the time it happened. While he identified both defendants at trial and previously from photolineups, his testimony was heavily impeached. Soon after the crime, Shorts had described petitioner as being in his 20s or early 30s, whereas petitioner was 46 at the time of the crime. *See* LAPD Follow-up Investigation Form at 1 (Oct. 29, 1992), *in* Trav., Exh. M. Shorts admitted on the stand that petitioner did not, in fact, look like he was in his 20s or 30s. R.T. 173.

Moreover, Shorts saw petitioner for only about two seconds, in circumstances where a positive identification would have been quite difficult. He testified that, on the morning of the crime, he was driving on the sixth level of the parking structure looking for an empty spot when his way was blocked by another car with one man behind the wheel and a second man standing next to it. Shorts stopped about ten feet behind the car, which soon drove away, leaving the second man behind. R.T. 155–56. The driver of the car was facing away from Shorts but, as the car started moving, the driver looked in his rear-view mirror and Shorts, still waiting behind, saw the driver's reflection. R.T. 171–72. On the stand a year and a half later, Shorts testified that he was positive that this two-second rear-view mirror re-

aware of the *Brady* violation, and the California Supreme Court summarily denied review. Petitioner discovered the failure to disclose over a year after he was convicted, and then raised the claim in his last two state habeas petitions, both of which were summarily dismissed. We interpret the California Supreme Court's summary denial of review without citation of authority to be a decision on the

merits. *Harris v. Superior Court,* 500 F.2d 1124, 1127–29 (9th Cir.1974) (en banc); *see also Greene v. Lambert,* 288 F.3d 1081, 1087 (9th Cir.2002). The state concedes in its brief that the California Supreme Court denied petitioner's *Brady* claim "on the merits," Appellee's Br. at 25, and does not claim that petitioner failed to exhaust the claim.

flection was of petitioner because he had "a very good memory with faces." R.T. 180.

Shorts's good memory for faces did not, however, extend to the second man, whom he first identified as someone named Wilson by picking him from a photo-lineup. R.T. 399. The police eventually excluded Wilson as a suspect, and Shorts picked Smith out of another photo-lineup. R.T. 170, 352–53.[8] The defense also brought out that a widely publicized $40,000 reward had been offered for information leading to the arrest and conviction of a suspect in connection with the Vardham killing, R.T. 363, 399, suggesting that Shorts's extraordinary efforts to help the police, including getting hypnotized to enhance his memory, showed more of an interest in collecting the reward than in telling the truth.

The testimony of the parking lot attendant was not merely unhelpful to the prosecution, it may have helped the defense. The attendant did not see the crime, nor could he identify petitioner or Smith as having been in the garage on the day of the crime. What he did say was that a car with two black men loosely fitting the description of petitioner and Smith had exited the garage at about the time of the crime, having been there five minutes. R.T. 228, 231–32; see page 16250 & n.2 supra. For those two men to have com-

mitted the crime, they must have entered the garage, driven up to the sixth level, accosted and robbed the victim—stabbing him 19 times as he tried to defend himself—and then driven out within the span of five minutes so their ticket could be marked as "no pay."

Implausible as this might be standing on its own, it clashes with Shorts's testimony that he saw Smith twice, once while looking for a parking space and again four or five minutes later, while sitting in his car reading his mail. R.T. 159–60, 175. The crime almost certainly wasn't committed during these minutes, because Shorts (who was parked on the level where Vardham was killed) had his car door open while he was reading his mail, yet didn't hear any screams or other sounds of an attack, nor did he see the other black man (the driver) return to the scene.

A detective testified that it would take about one minute to drive from the garage entrance to the sixth level, R.T. 141–42; presumably, it would take some similar time to get back down again, for a total of at least two minutes. When added to the time Smith was on the sixth level on foot, according to Shorts, that would exceed the five minutes the car was in the garage.

This would leave no time for petitioner and Smith to commit the crime or for the

8. The circumstances of the Wilson misidentification may have cast doubt on Shorts's recollection and candor, as well as on the police identification procedures. When he spoke to the police, Shorts identified the car he saw as having an unusual color. Based on the color and, apparently, also on license plate numbers that Shorts gave the police after he had himself hypnotized to enhance his recollection of the event, R.T. 167–68, 417, the police showed Shorts a picture of Wilson's car, which the witness identified as looking like the one he had seen in the garage the morning of the crime. Police then showed Shorts a six-pack photo-lineup that included Wilson's picture and, sure enough, Shorts selected Wil-

son as someone who "looked like the pedestrian he had seen." R.T. 417. During cross-examination, Shorts repeatedly denied having selected Wilson from a photo-lineup, but a detective testified that Shorts had in fact done so. R.T. 170–71, 177, 416–17. In his summation, defense counsel hammered hard that Shorts had managed to select the owner of the car shown to him by the police, even though this person had no connection whatsoever to the crime. Defense counsel argued not only that Shorts was an unreliable witness, but also that the police must have been suggestive in their presentation of the photo-lineup of Wilson, and hence of petitioner and Smith as well. R.T. 494–95.

pedestrian to get back into the car at a lower level so the parking lot attendant could observe two black men in the exiting no-pay car exactly five minutes after it entered. The parking lot attendant's testimony at best adds nothing to the prosecution's case and at worst further undermines Shorts's testimony.

The only witness who claimed to have seen the crime was Rosemond. But Rosemond was far from an ideal witness. He was a thrice-convicted car burglar who had been up all of the previous night smoking crack, and who was in the garage the morning of the murder to steal car radios to fuel his drug habit. He claimed that the police offered to help him get into a prison drug treatment program and have him incarcerated out of state "for [his] protection," and they threatened to charge him with the murder if he didn't tell them everything he knew. E.R. 43–45; R.T. 246–47, 291–92. Rosemond testified that, though he saw petitioner beating up (not stabbing) the victim, he didn't intervene because it was none of his business—but he did come back minutes later to see what was in it for him, and he picked the dying victim's ATM card off the ground instead of calling for help. When the police arrived, they didn't find Rosemond at the scene and weren't aware of his claim that he had witnessed the crime until two months later. E.R. 23–25. Shorts did not testify to seeing Rosemond, though they were supposedly on the same level of the parking garage at about the time of the crime, nor did Rosemond claim to have seen Shorts.

Given Shorts's and the parking lot attendant's independently inconclusive and jointly inconsistent testimony, and putting the matchbook evidence aside, the jury may have been reluctant to find petitioner guilty beyond a reasonable doubt based on Rosemond's testimony alone. Indeed, the jurors could have suspected that Rosemond himself killed Vardham, since just as much linked him to the crime scene as the two defendants. This underscores the importance of the matchbook evidence, which provided a circumstantial anchor for Rosemond's story. While the handwriting evidence was not particularly strong, it could have provided a sufficient basis for concluding that the number in the matchbook was written by Vardham, and that the matchbook must therefore have been taken by Vardham's assailant at the time of the crime.

The evidence the prosecution did not disclose to the defense was therefore crucially significant. As discussed above, this evidence—particularly the fact that Ferdous didn't know Vardham—could have severely undermined the handwriting testimony.[9] Had the defense attorney known about the police interview with Ferdous and called him to the stand, and had Ferdous told the same story under oath, the jury might have come to doubt the handwriting expert's somewhat tentative conclusions. The jury then might have found that, because Ferdous didn't know Vardham and didn't give him the phone number, Vardham didn't have the Shalimar matchbook in his possession when he was murdered.

The prosecutor spent a good part of his summation arguing the importance of the matchbook. R.T. 471–74. We also know that the jury thought carefully about the

---

9. We note that handwriting analysis is, even in the best of circumstances, not an exact science. A highly respected district judge has concluded that such evidence must be used with caution because it has "serious problems" under the *Daubert* and *Kumho Tire* standard for scientific reliability. *See United States v. Hines,* 55 F.Supp.2d 62, 68 (D.Mass. 1999) (Gertner, J.).

matchbook because it submitted a question about it: "Regarding the phone number inside the matchbook, did anyone at this number know anyone else connected with this case, i.e., [the] victim, his friends, family or Mr. Smith?" R.T. 270. The jury was thus well aware of the matchbook's significance, and struggled to connect it to anyone involved in the crime. Had the jurors concluded that the person most likely to have given out the phone number did *not* give it to Vardham, this would probably have destroyed the matchbook as a link between petitioner and the victim, leaving no physical evidence tying petitioner to the crime. The jury would then have had to convict based on Rosemond's highly questionable testimony alone.

The jurors had trouble convicting petitioner even as it was. On the third day of deliberations, they sent a note indicating that they were "hopelessly deadlocked." E.R. 37. The next afternoon, the jury requested readbacks of several pieces of testimony, including the handwriting expert's statements. E.R. 39. The jury was clearly struggling to reach a verdict, and they may well not have convicted without the matchbook evidence. Petitioner was therefore prejudiced by the prosecution's failure to disclose the exculpatory matchbook evidence, in particular the evidence about the meeting with Ferdous. There is a " 'reasonable probability' of a different result" had the evidence been disclosed. *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375 (Blackmun, J.)). By failing to disclose this evidence, the prosecution thus violated its obligation under *Brady*. The contrary conclusion of the state courts was an unreasonable application of well-established federal law. *See* 28 U.S.C. § 2254(d)(1); *Lockyer v. Andrade*, 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

4. Petitioner raises other serious issues challenging his conviction. For instance, he alleges additional prosecutorial misconduct: During closing argument, the prosecutor mischaracterized him as a drug dealer. Appellant's Br. at 29–30 (filed Sept. 23, 1999). Also, he claims ineffective assistance of counsel: His attorney failed to produce his own handwriting expert at trial, failed to object to the prosecutor's mischaracterization of petitioner as a drug dealer, failed to put petitioner on the stand and failed to investigate the matchbook. *Id.* at 35–54. While these allegations are not trivial, we do not address them. Because we conclude that petitioner's trial was constitutionally deficient as a result of the *Brady* violation, we need not deal with these other issues, which are unlikely to recur if there is a retrial. If the case returns to us in a subsequent appeal by petitioner, we will address the issues at that time.

\* \* \*

The case is remanded so that the district court may determine whether the state disputes that the prosecution failed to disclose to the defense that neither Khan nor Ferdous recognized Vardham's photo. If the state does dispute this, the district court shall hold an evidentiary hearing and resolve the dispute. If petitioner's claim that this evidence was not disclosed is either conceded or found to be true, the district court shall issue a conditional writ of habeas corpus ordering that petitioner be released unless he is retried within a reasonable time to be set by the district court.

**REVERSED AND REMANDED.**