**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TIMOTHY GANTT,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>CITY OF LOS ANGELES; RICK LANE, #116702; JOSE L. REYES, #21778; AL GONZALES, #15614; LOUIS TROVATO; WILLIE WILLIAMS,<br>*Defendants-Appellees*. | No. 11-55000<br><br>D.C. No.<br>2:08-cv-05979-ODW-CW |
| MICHAEL SMITH,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>CITY OF LOS ANGELES; RICK LANE, #16702; JOSE L. REYES, #21778; AL GONZALES, #15614; LOUIS TROVATO; WILLIE WILLIAMS,<br>*Defendants-Appellees*. | No. 11-55002<br><br>D.C. No.<br>2:09-cv-08565-ODW-CW<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted
February 11, 2013—Pasadena, California

Filed May 31, 2013

Before: Alex Kozinski, Chief Judge, Andrew J. Kleinfeld
and Barry G. Silverman, Circuit Judges.

Opinion by Judge Silverman;
Dissent by Judge Kleinfeld

**SUMMARY**[*]

**Civil Rights**

The panel reversed the district court's judgment in favor of defendants the City of Los Angeles and others and remanded for a new trial in these consolidated actions brought under 42 U.S.C. § 1983 after plaintiffs' murder convictions were vacated.

Plaintiffs were released from jail after, on retrial, a key eyewitness recanted testimony that was allegedly obtained as a result of coercive and abusive investigative techniques. The panel held that in plaintiffs' § 1983 actions, the district court erred in instructing the jury about the level of culpability required for a deliberate fabrication of evidence claim under the Fourteenth Amendment. The panel held that the court misled the jury when it appeared to equate the shocks-the-

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

conscience standard with an intent to injure. Moreover, the panel held that the instructional error was not harmless because given the evidence, a reasonable juror could have concluded that defendants used investigative techniques that were so coercive and abusive that they should have known that those techniques would yield false information.

The panel held that at retrial the district court additionally should consider whether a *Brady* instruction was warranted and should also give a corrected conspiracy instruction.

Dissenting, Judge Kleinfeld stated the fabrication of evidence jury instruction was harmless because the fabrication claim should not have gone to the jury at all. Judge Kleinfeld stated that there was no evidence that police exerted their pressure on the key witness in order to make him testify to what the police believed to be false.

## COUNSEL

Emmanuel C. Akudinobi (argued) and Chijioke O. Ikonte, Law Offices of Akudinobi & Ikonte, Los Angeles, California, for the Plaintiffs-Appellants.

Carmen A. Trutanich, City Attorney, Lisa S. Berger (argued) and Amy Jo Field, Deputy City Attorneys, Office of the City Attorney, Los Angeles, California, for Defendants-Appellees.

## OPINION

SILVERMAN, Circuit Judge:

Plaintiff-Appellants Timothy Gantt and Michael Smith were tried and convicted of the August 19, 1992 murder of Kalpesh Vardhan.   An Arthur Andersen Consulting employee, Vardhan was stabbed to death in a parking garage in downtown Los Angeles.   This is the second time this matter has come before us.   In 2004, we reversed the denial of Gantt's federal habeas petition and remanded the case for an evidentiary hearing. *Gantt v. Roe*, 389 F.3d 908, 916 (9th Cir. 2004).[1]  That resulted in the issuance of the writ, a retrial and, after the key witness recanted his testimony, the dismissal of all charges with prejudice during the course of the trial.   Smith won release in 2009 on a habeas petition. The instant appeal concerns the unsuccessful lawsuits under 42 U.S.C. § 1983 filed by Gantt and Smith following their release.   The case proceeded to trial and resulted in a verdict for the defendants on all claims.   On appeal, Gantt and Smith challenge certain jury instructions and evidentiary rulings. We reverse and remand for a new trial.

## BACKGROUND

During the original criminal trial that resulted in Appellants' convictions, three witnesses attempted to connect Gantt and Smith to the murder.   The sole alleged eyewitness to the crime was a local car burglar named David Rosemond, whom the police picked up two months after the murder on a burglary charge.   Rosemond claimed he was in the parking

---

[1] A full recounting of the facts of the underlying crime and additional aspects of the investigation are contained in the 2004 opinion.

garage on the morning Vardhan was killed, looking to steal car radios to finance a drug habit.  He testified that he saw Gantt beating up the victim and Smith standing next to them, holding a gun.  Rosemond did not intervene or call for help but, after the assailants had fled, he approached the scene and took the dying victim's ATM card.

LAPD homicide detectives Jose Reyes and Rick Lane, both Defendant-Appellees here, interrogated Rosemond. Rosemond testified that, at the time he was taken into custody, he had been awake for approximately two days straight on a crack binge and was still under the influence when he made his identifications.  Over the course of the hours-long interrogation, the detectives threatened to charge him with the murder if he did not provide information: "They said if I didn't give them something, that I would go down for it."[2]  Rosemond also testified as follows:

> It was some days.  It wasn't just one day.  It was like, I don't know, four or five or six hours in that little room.  And then I would go back to my cell and they would bring me back the next day and ask me more questions and show me pictures.  It was kind of like trying

---

[2] Deputy District Attorney Grace testified that Rosemond said the detectives had informed Rosemond of the $40,000 reward put up by the City of Los Angeles and Arthur Andersen Consulting because he was reluctant to testify, and instructed him not to say anything about the reward in court.  Ultimately, Rosemond was awarded a portion of the $40,000 total for his testimony.  However, it appears that the court overruled a colorable hearsay objection to Grace's testimony as to Rosemond's statements.  Since no exception applied, this was improperly admitted, and we do not consider it.

to scare me. I don't know if that was their
intention.

Additionally, Rosemond told Reyes and Lane that he believed
Gantt had once robbed him, but this statement did not make
it into their reports or the chronological log, or come out at
trial. During the first trial, Rosemond testified on cross-
examination that he bore no animosity towards Gantt and had
no reason to have any biased view of him.

The District Attorney's office initially rejected the case,
in part, because of concerns about Rosemond's credibility
and granting Rosemond immunity. The evidence was
subsequently reviewed by a different prosecutor who decided
to go forward with the case after re-interviewing Rosemond.

The second witness was Kevin Shorts, a CPA at Arthur
Andersen, who claimed he saw Gantt and Smith near the
scene of the crime around the time of the murder. Shorts told
Lane and Reyes that he saw Gantt driving a vehicle on the
sixth floor of the garage and that he was able to see Gantt's
face reflected in a rear-view mirror for a matter of seconds.
He identified Gantt from a photo array. However, Shorts
initially identified an individual by the name of Raymond
Wilson as the accomplice who was standing outside the
vehicle, before identifying Smith. While parked on the sixth
floor of the garage reading his mail, Shorts did not hear any
screaming or sounds of an attack or struggle; nor did he see
Rosemond. Shorts collected a $20,000 reward for his
testimony.

The third witness was Jose Cubias, the parking garage
attendant on duty. Cubias did not witness the crime either,
but he did see a car with two black men exit the garage. He

testified that he recalled the vehicle because it was the only no-pay ticket that day—the car was in the garage for only approximately five minutes and, therefore, no fee was charged. Cubias identified the vehicle from a composite sketch and initially was able to say Gantt's photo resembled the driver.

The only physical evidence potentially linking Gantt to the crime was a matchbook from an Indian restaurant in the Los Angeles area, which was found on his person at the time of his arrest. The prosecution's theory was that this item was lifted from Vardhan's person at the time of the crime. The matchbook contained a handwritten phone number, but the handwriting analysis could not conclusively link it to the victim. The 19-digit phone number connected to an individual in Bangladesh who did not recognize Vardhan's name or photo. The man's son, who worked at the restaurant, also did not recognize Vardhan from the photo. In 2004, we held that the prosecutors had violated *Brady* by failing to disclose that these individuals had not recognized the victim. *Gantt*, 389 F.3d at 910–11. We reversed the denial of Gantt's federal habeas petition on the grounds that given the weakness of the prosecution's evidence and the state's reliance on the matchbook, these *Brady* violations were not harmless and could well have altered the outcome of the case. *Id*. at 915–16. Our decision did not reach any of Gantt's other claims. We remanded the case for an evidentiary hearing to determine whether the disclosure violations had in fact occurred. *Id*. at 916. On remand, the district court granted Gantt's habeas petition, and a retrial was scheduled.

In the middle of the retrial in 2008, Rosemond recanted his original testimony, which had pinned the murder on Gantt and Smith. The prosecution moved to dismiss all charges

against Gantt with prejudice, and he was released. Smith subsequently prosecuted a writ of habeas corpus and was released in 2009.

Gantt and Smith filed separate Section 1983 actions, which were consolidated for discovery and trial. Gantt's Second Amended Complaint stated the following claims under 42 U.S.C. §§ 1983, 1985: (1) malicious prosecution; (2) due process violation based on *Brady* violations, failure to preserve or analyze evidence, and fabrication of evidence; (3) reckless indifference to civil rights; (4) conspiracy under § 1985; (5) conspiracy to violate Gantt's constitutional rights under § 1983; and (6) *Monell* liability. He named as defendants retired detectives Lane and Reyes, the County of Los Angeles, the City of Los Angeles, Al Gonzales, Lieutenant Louis Trovato, LAPD Chief Willie Williams, Deputy D.A. Sterling Norris, and D.A. Investigator Edward Boyer.[3]

The Smith Complaint, filed over six months later in November 2009, against the City of Los Angeles, Lane, Reyes, Gonzales, Lieutenant Trovato, and LAPD Chief Williams, stated the following claims: (1) malicious prosecution; (2) due process violations premised on the non-disclosure of *Brady* and *Giglio* evidence; (3) failure to gather, preserve, and/or disclose material exculpatory evidence; (4) fabrication of evidence; (5) unconstitutionally suggestive line-up and identification procedures; (6) *Monell* liability; (7) reckless indifference to civil rights; (8) failure to intervene to

---

[3] Gonzales, LAPD's homicide unit supervisor during the investigation of the murder, served as Reyes and Lane's immediate supervisor. As commanding officer for the division, Lieutenant Trovato supervised Gonzales.

prevent civil rights violations; and (9) conspiracy under 42 U.S.C. § 1985.

On April 9, 2009, the court granted a motion for judgment on the pleadings as to the County of Los Angeles, Deputy D.A. Norris, and D.A. Investigator Boyer, citing absolute prosecutorial immunity and ruling that *Monell* liability does not apply to a county in such circumstances.

The case was divided into individual liability, *Monell* liability, and punitive damages phases. Gantt and Smith dismissed their claims against Gonzales, Williams, and Trovato, and withdrew their § 1985 conspiracy claims. Additionally, Smith withdrew his claim for reckless indifference to civil rights violations, as well as his claim for failure to intervene to prevent civil rights violations. Thus, the case proceeded on the malicious prosecution, due process and fabrication of evidence, *Brady/Giglio*, failure to gather and preserve evidence, unconstitutional identification, conspiracy to violate constitutional rights under § 1985, and *Monell* liability claims against Defendants Lane, Reyes, and the City of Los Angeles. A jury returned a verdict for the Defendants on all these claims.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. "The standard of review for an alleged error in jury instructions depends on the nature of the claimed error." *Jenkins v. Union Pac. R.R. Co.*, 22 F.3d 206, 210 (9th Cir. 1994). "A district court's formulation of the jury instructions is reviewed for abuse of discretion. If, however, the instructions are challenged as a misstatement of the law, they are then reviewed de novo." *Duran v. City of Maywood*, 221 F.3d

1127, 1130 (9th Cir. 2000) (per curiam) (internal quotation marks and citation omitted). Incomplete instructions are treated as legal errors and reviewed de novo as well. *Dang v. Cross*, 422 F.3d 800, 804–06 (9th Cir. 2005).

"We have stressed that jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *Id*. at 804 (alteration, quotation marks, citation omitted). "Further, '[a] party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence.'" *Id*. at 804–05 (quoting *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002)). There must be a sufficient evidentiary foundation to support giving the instruction. *Yan Fang Du v. Allstate Ins. Co.*, 697 F.3d 753 (9th Cir. 2012) (citing *Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1117–18 (9th Cir. 2008)). "Whether there is sufficient evidence to support an instruction is reviewed for abuse of discretion." *Id*. (citations omitted).

"If, however, the error in the jury instruction is harmless, it does not warrant reversal." *Dang*, 422 F.3d at 805. "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." *Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir. 2001) (alteration in original; internal quotation marks and citations omitted). Harmless error review for a civil jury trial is as follows:

> An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless. Because we presume prejudice where civil trial error is

concerned, the burden shifts to the defendant to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed.

*Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (internal citations and quotation marks omitted). "Prejudice is also generally more likely than not if 'nothing about th[e jury's] verdict indicates that the result would have been the same without the error.'" *Id*. (quoting *Caballero v. City of Concord*, 956 F.2d 204, 207 (9th Cir. 2009)).

## DISCUSSION

### 1. Fabrication of Evidence

The district court erred in instructing the jury about the level of culpability required for a deliberate fabrication of evidence claim under the Fourteenth Amendment. In *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc), we held that "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id*. at 1074–75. We stated that in order to establish deliberate fabrication of evidence, a plaintiff

> must, *at a minimum*, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have

known that those techniques would yield false information.

*Id*. at 1076.  Plaintiffs adduced no evidence to support the first theory, so they only could be relying on the second *Devereaux* basis.

Regarding the required level of culpability, due process violations under the Fourteenth Amendment occur only when official conduct "shocks the conscience," *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010), but what that means "depends on the context," *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  In *Wilkinson*, we explained that:

> Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience.  On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.

610 F.3d at 554 (citations omitted).  And in *Tennison*, we also made clear that acting with "deliberate indifference to or reckless disregard for an accused's rights" was "consistent with the standard imposed in the substantive due process context, in which government action may violate due process if it 'shocks the conscience.'"  570 F.3d at 1089.

The relevant portion of the instruction the court gave the jury was as follows:

> Coercive and abusive investigative techniques violate a person's 14th amendment [right] to due process when they shock the conscience, that is, the conduct of the police officer is intended to injure in some way, unjustified by any governmental interest. Torture is an example of a coercive and abusive investigative technique.
>
> Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.[4]

This explanation of the law was confusing and misleading in two related respects. First, it failed to state the intent-to-injure and deliberate-indifference standards in a clear disjunctive format, so that a reasonable juror would understand each of these satisfies the broader "shocks-the-conscience" standard. Second, it included only torture as an example of what would satisfy the "shocks-the-conscience standard." Had the court given only the second paragraph as an instruction on the level of culpability, there would be no

---

[4] The instructions quoted in this opinion are taken from the final written jury instructions. There are immaterial variances between the written set of instructions and the transcript recording the court's verbal instructions to the jury.

error.  None of the proffered evidentiary bases for this claim involved "a snap judgment because of an escalating situation," *Wilkinson*, 610 F.3d at 554, so the court could have simply omitted the intent-to-injure (or purpose-to-harm) standard altogether.  Instead, the court misled the jury when it appeared to equate the "shocks-the-conscience" standard with an intent to injure.

The question is whether the instructional error was harmless.  The district court recognized that there was sufficient evidence to submit the claim to the jury.  On our own independent review of the evidence, we concur that there was sufficient evidence to instruct the jury on the claim of fabrication of evidence.  Rosemond testified that the detectives threatened to charge him with the murder if he did not provide information.  The manner and circumstances of Rosemond's interrogation also support the conclusion that there was sufficient evidence to send this claim to the jury: "[Q:] Did any of the officers show you some materials where they told you don't say we showed you this? . . . . [A:] I would say yes."  Furthermore, Lane and Reyes did not think Rosemond was still under the influence during the interrogation, but he testified that he had been awake for approximately two days straight on a crack binge, and was in fact still high when he made his identifications.  A reasonable juror could have concluded that the "Defendants used investigative techniques that were so coercive and abusive that they . . . should have known that those techniques would yield false information." *Devereaux*, 263 F.3d at 1076.  The question was triable and for the jury to resolve.

As the district court itself recognized, the plaintiffs produced enough proof of their claim of fabrication of evidence both to survive a motion for judgment as a matter of

law and to have the jury instructed on that theory. It therefore follows that the erroneous jury instructions cannot be deemed harmless for lack of proof. Accordingly, we reverse and remand for a new trial on the fabrication of evidence claim.

### 2. *Brady* Claim

We have held in no uncertain terms that *Brady*'s requirement to disclose material exculpatory and impeachment evidence to the defense applies equally to prosecutors and police officers. *Tennison*, 570 F.3d at 1087. "*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." *Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006) (per curiam) (citation and quotation marks omitted). "To state a claim under *Brady*, the plaintiff must allege that (1) the withheld evidence was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff." *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011); *accord Milke v. Ryan*, No. 07-99001, 2013 WL 979127, at *13 (9th Cir. Mar. 14, 2013).

The district court declined, without explanation, to give an instruction on the *Brady* claim. That claim was premised on the police officers' failure to disclose that Rosemond told them that he had been robbed by Gantt in the past. Plaintiffs contend that they could have used that information to show Rosemond's animosity towards Gantt and thereby impeach his story. However, it is possible that the court reasoned that the police cannot be faulted for failing to see the mitigating value of Rosemond's statement about the prior robbery. Indeed, the court may have concluded the police reasonably

viewed it as more incriminating than mitigating by showing both Gantt's propensity to rob and his familiarity with the person he purported to identify. At any retrial in this matter, the court should consider whether a *Brady* instruction is warranted and explain its ruling.

### 3.  Conspiracy Under 42 U.S.C. § 1983

Defendants concede that the conspiracy instruction was erroneous, but argue harmlessness. The court gave an instruction for a 42 U.S.C. § 1985 claim, but Plaintiffs were prosecuting a § 1983 claim. If a new trial is to be held, the correct conspiracy instruction must be given.

### 4.  Remaining Assignments of Error and Claims

Plaintiff-Appellants' remaining assignments of error either lack merit or the claims are not supported by sufficient evidence in the record, such that any claimed instructional error was harmless—or both. Because we find reversible instructional error in this case and remand for a new trial, we need not rule on the claimed errors in the district court's evidentiary rulings. However, if Plaintiffs again seek to use a police-practices expert, the court may not exclude this testimony without first allowing Plaintiffs to make a proffer and then giving specific reasons for the exclusion.[5]

---

[5] Plaintiff-Appellants complain that Judge Wright was biased against them. We find no reason to reassign this matter. Mindful that this was a difficult case to try, we respectfully remind the district court and the parties to maintain an atmosphere of mutual respect and civility.

## CONCLUSION

Accordingly, we **REVERSE** and **REMAND** for a new trial limited to the specific claims outlined above.

---

KLEINFELD, Senior Circuit Judge, dissenting:

Gantt and Smith did not get a fair trial. We therefore caused their convictions to be vacated. The evidence against them was weak, so when one of the prosecutor's three main witnesses changed his story in the middle of Gantt's second trial, the prosecutor dismissed. Both are now free, and further prosecution is barred. Their guilt or innocence, and the fairness of their first criminal trial, are no longer before us.

What we have before us are their civil lawsuits against the two police officers who instigated the prosecution. The trial judge let the fabrication of evidence claim get to the jury, and gave some arguably confusing or erroneous instructions. Any such trial error, though, was harmless, because plaintiffs lacked a prima facie case.

That is not to suggest that Gantt and Smith were treated fairly in the criminal proceedings, or that they committed the murder. From all we can tell from the record, the two police detectives thought Gantt and Smith had murdered Kalpesh Vardhan, and did all they could, rightly and wrongly, to get them convicted for it. The evidence against Gantt and Smith, though, was very thin, and, whatever the police detectives thought, the prosecutor did not think he could prove murder once a key witness changed his story. One of the three witnesses, the accountant, was shaky on the identifications.

The second, the one who changed his story in the middle of the second trial, was a thief in the garage to steal car stereos. He was not very credible, both because he was a thief, and because (though the prosecutors and police hid this from defense counsel), he probably had a grudge against Gantt. The third witness, the parking garage attendant, seems to me to be as supportive of the defense as of the prosecution. On the one hand, he was the best witness for putting Gantt and Smith in the garage at the right time, but on the other hand, their parking garage ticket put them there for what sounds like too short a time to locate, rob, and kill the victim. The only physical evidence was a matchbook Gantt had from an Indian restaurant, used by the prosecution to suggest that the non-Indian defendants took it from the ethnically Indian victim. The matchbook turned out to be a false lead because no one could establish that the Indian victim had ever been to the restaurant. The prosecution hid from the defense in the first trial the evidence that it was a false lead.

But the thinness of the evidence for murder does not establish fabrication of evidence, the theory the majority accepts. The tort theory would be, basically, that the prosecutors and police knew Gantt and Smith were innocent and prosecuted them anyway, and created false evidence with which to do it. Gantt and Smith failed to establish a prima facie case for fabrication of evidence.

Any inadequacy in the fabrication of evidence jury instruction was harmless, because the fabrication claim should not have gone to the jury at all. The constitutional violation claimed is that the police denied due process of law to Gantt and Smith by fabricating evidence. The supposedly fabricated evidence was the car stereo thief's identification.

"Fabrication" means creating something in order to deceive.[1] The interrogation techniques used on Rosemond, the car stereo thief, may have violated his rights but that is not enough to establish that Gantt's and Smith's rights were violated. There was no evidence that the police exerted their pressure on Rosemond in order to make him testify to what the police believed to be false.

Had one of the policemen gone to an Indian restaurant, obtained a matchbook, and planted it in Gantt's pocket, in order to tie him to the ethnically Indian victim, that would be fabrication of evidence. Or had the car stereo thief told the police that Gantt and Smith were not the men he saw, and they told him, "testify that he was, or we'll frame you for the murder," that would be fabrication of evidence. The due process violation consists, essentially, of creating false evidence to frame someone for a crime.

We spoke to what "fabrication of evidence" means in *Devereaux v. Abbey*,[2] an en banc case arising out of the Wenatchee "sexual abuse 'witch hunt' in which 43 adults were charged with over 29,000 counts of sexual molestation."[3] We held that "there is a clearly established constitutional due process right not to be subject to criminal charges on the basis of false evidence that was deliberately fabricated by the government."[4] We deemed such fabrication

---

[1] The American Heritage Dictionary 484 (2d. coll. ed. 1985).

[2] *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc).

[3] *Id.* at 1073.

[4] *Id.* at 1074–75.

comparable to knowing use of perjured testimony, the subject of the Supreme Court decision in *Pyle v. Kansas*.[5]

Yet the "fabrication" claim was unsuccessful as a matter of law even in the Wenatchee witch hunt. We held that, even though the lengthily interrogated children who denied having been sexually molested were pressured for hours until they changed their stories to what the investigating detective and social workers wanted them to say, the victim of the false charges "ha[d] not adduced or pointed to any evidence in the record to support" a fabrication claim.[6] He would have had to show either that the defendants continued investigating him even though they "knew or should have known that he was innocent," or that their techniques "were so coercive and abusive that they knew or should have known that those techniques would yield false information."[7] We held that the "critical element" of the "coercive and abusive" claim was that the defendants "knew or should have known that they were eliciting false accusations."[8] We held that improper investigation "is one thing, intentionally fabricating false evidence is quite another."[9] Even pressuring child witnesses for long periods of time to change their stories was not enough to get past summary judgment, because the victim of the false charges lacked evidence that the investigators knew

---

[5] *Id*. at 1075 (discussing *Pyle v. Kansas*, 317 U.S. 213 (1942)).

[6] *Id*. at 1076.

[7] *Id*.

[8] *Id*.

[9] *Id*. at 1077.

or should have known that he "was innocent," or that their improper techniques "would yield false information."[10]

Under *Devereaux*, pressuring the car stereo thief to implicate Gantt and Smith did not entitle them to trial, much less setting aside a jury verdict for fabrication of evidence, because the police did not know (nor do we) that they were innocent, or that the interrogation techniques would yield a false identification. As for the suggestion that if he could not identify Gantt and Smith as the perpetrators, they would "put it on" him, they did not know that Gantt, Smith, or the car stereo thief was innocent, so the coercive threat is not "fabrication" under *Devereaux*.

In Gantt's and Smith's case, there was no witch hunt. There is no particular reason to think that Gantt and Smith are innocent, much less that the police knew they were. There is no showing that the police believed the identification the car stereo thief made was false. He himself has not claimed that he lied twenty years ago, just that he can no longer remember and had not been wearing his glasses. We held in the Wenatchee witch hunt cases that the plaintiffs were not entitled to get to trial on their fabrication of evidence cases.[11] *A fortiori*, the far less coercive questioning and the lack of any reason to infer a frameup of an innocent man did not entitle Gantt and Smith to put their fabrication case before a jury. Here the plaintiffs were mistakenly permitted to try their cases, and the jury returned verdicts that a correct application of law would have compelled regardless of their

---

[10] *Id.*

[11] *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc); *Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003).

verdicts. The fabrication of evidence claim is no more than a claim that false evidence, not known by the prosecution to be false, was used to convict them.

Because the fabrication of evidence claim should not have gone to trial at all, there being no prima facie case, we need not reach the questions about the correctness of the instructions. The case was put to the jury, which reached the legally required conclusion despite the poor instructions. The publication of today's decision vastly expands the application of § 1983 to failed prosecutions, in quite a dangerous way. Now police pressure on a witness to tell what the police believe to be the truth arguably opens the door to a § 1983 claim. We should affirm on the fabrication of evidence claims, the basis for the reversal.