**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| ROCHELLE SCOTT, individually, and as co-special administrator of the estate of ROY ANTHONY SCOTT; FREDRICK WAID, as co-special administrator of the estate of ROY ANTHONY SCOTT, | No.23-15480<br><br>D.C. No.<br>2:20-cv-01872-<br>RFB-EJY |
| *Plaintiffs-Appellees*, | OPINION |
| v. |  |
| KYLE SMITH; THEODORE HUNTSMAN; LAS VEGAS METROPOLITAN POLICE DEPARTMENT, |  |
| *Defendants-Appellants*. |  |

Appeal from the United States District Court
for the District of Nevada
Richard F. Boulware II, District Judge, Presiding

Argued and Submitted May 13, 2024
Phoenix, Arizona

Filed July 30, 2024

Before:  Roopali H. Desai and Ana de Alba, Circuit Judges,
and Philip S. Gutierrez,[*] District Judge.

Opinion by Judge Desai

---

### SUMMARY[**]

---

### Qualified Immunity / Excessive Force

The panel affirmed the district court's denial of qualified immunity to Las Vegas Metropolitan Police Department officers on a Fourth Amendment claim for violation of the right to be free from excessive force, and reversed the district court's denial of qualified immunity on a Fourteenth Amendment claim for violation of the right to familial association.

Roy Scott, who was unarmed and in mental distress, called the police for help. Officers used force to restrain him, although he complied with officers' orders and was not suspected of a crime, and shortly after lost consciousness and was later pronounced dead. Scott's daughter Rochelle and a representative of Scott's estate sued the Department and two officers.

The panel affirmed the district court's denial of qualified immunity on plaintiffs' Fourth Amendment claim. Viewing

---

[*] The Honorable Philip S. Gutierrez, United States District Judge for the Central District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the facts in the light most favorable to plaintiffs, the officers violated Scott's Fourth Amendment right to be free from excessive force. Because Scott was mentally ill, was not suspected of a crime, and did not present a risk to officers or others, the government's interest in applying force was limited. A reasonable jury could find that the officers' use of severe or deadly force was constitutionally excessive. The panel further held that Scott's Fourth Amendment rights were clearly established at the time of the violation. *Drummond ex rel. v. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), clearly established that the officers' use of force was constitutionally excessive.

The panel reversed the district court's denial of qualified immunity on Rochelle's Fourteenth Amendment claim. Viewing the facts in the light most favorable to plaintiffs, the officers violated Rochelle's right to familial association. However, because that right was not clearly established at the time of the officers' conduct, the officers were entitled to qualified immunity.

## COUNSEL

Peter Goldstein (argued), Law Offices of Peter Goldstein, Las Vegas, Nevada, for Plaintiffs-Appellees.

Craig R. Anderson (argued), Marquis Aurbach Coffing, Las Vegas, Nevada, for Defendants-Appellants.

**OPINION**

DESAI, Circuit Judge:

Early in the morning on March 3, 2019, Roy Scott called the police for help. But he did not get it. Las Vegas Metropolitan Police Department Officers Kyle Smith and Theodore Huntsman came to the scene. Scott was unarmed and in mental distress. Though he complied with the officers' orders and was not suspected of a crime, Smith and Huntsman initiated physical contact, forced Scott to the ground, and used bodyweight force to restrain him. Shortly after, Scott lost consciousness and he was later pronounced dead. Scott's daughter and a representative of Scott's estate sued the officers and the Department for violating their constitutional rights, including the Fourth Amendment right to be free from excessive force and the Fourteenth Amendment right to familial association.

Officers Smith and Huntsman appeal the district court's order denying summary judgment on the basis of qualified immunity. We hold that, construing the facts in the light most favorable to Plaintiffs, Smith and Huntsman violated Scott's Fourth Amendment rights. Because the applicable law was clearly established at the time of the incident, we affirm the denial of qualified immunity for Plaintiffs' Fourth Amendment claim. As to Rochelle Scott's Fourteenth Amendment claim, we hold that Officers Smith and Huntsman violated Rochelle Scott's Fourteenth Amendment right to familial association, but that right was not yet "clearly established" at the time of the violation. We thus affirm in part and reverse and remand in part.

## BACKGROUND

Early in the morning on March 3, 2019, Roy Scott called 911.[1] He reported multiple assailants outside his apartment with a saw. Las Vegas Metropolitan Police Department Officers Smith and Huntsman were assigned to the call. Dispatch notified the officers that Scott was mentally ill.

Scott was distressed and hallucinating when Officers Smith and Huntsman arrived at his apartment. After Smith and Huntsman knocked and identified themselves, Scott yelled to the officers to "break the door down" claiming that there were people inside his house. The officers did not break the door in because they did not hear anyone inside the apartment. Instead, they continued to knock and order Scott to come to the door. About two minutes after first knocking on the door, Smith told Huntsman, "this is a 421A for sure," using the department code to indicate he believed Scott was mentally ill. Huntsman then called through the door: "Sir, have you been diagnosed with any mental diseases?" After Scott did not come to the door, Smith asked dispatch to call Scott back to ask him to come to the door, noting again that Scott appeared to be mentally ill. Smith then said to Huntsman: "I ain't going in there. That's too sketchy." Huntsman agreed, "That dude's wacky." Peering into Scott's window, Huntsman asked Smith if he could see the "crazed look in [Scott's] eye." They could not see anyone else in Scott's apartment.

When Scott did not open the door, Smith called their sergeant, turning off his body worn camera. On Huntsman's

---

[1] This is an interlocutory appeal challenging the denial of qualified immunity. As we recount the facts here, we thus resolve all disputed factual issues in Plaintiffs' favor. *See Est. of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021).

camera, Smith can be heard telling their sergeant that Scott sounds mentally ill. After ending the call, Smith told Huntsman that their sergeant said that "at the end of the day we can't do anything if we don't hear any reason to have an exigent circumstance." Smith also explained that their Sergeant suggested they try again to get Scott to come to the door. Smith resumed knocking and ordered Scott to come to the door. Seconds later, and about seven minutes after Smith and Huntsman arrived on the scene, Scott opened the door.

As Scott opened the door, Smith retreated down the stairs in front of Scott's apartment. Scott held a metal pipe at his side as he descended the stairs. He immediately dropped the pipe when officers asked him to do so. Disoriented, Scott asked the officers twice: "What am I supposed to do?" Smith and Huntsman directed him to stand near a wall at the base of the stairs, and Scott immediately complied. When Huntsman asked Scott if he had any other weapons, Scott produced a knife from his front pocket and said, "I am sorry." He handed the knife to Huntsman handle-side out and did not make any threatening gestures.

Smith and Huntsman ordered Scott to face the wall, shining a flashlight at him. Scott told them that the light bothered him and that he had paranoid schizophrenia. He asked twice: "Can you just put me in the car please?" When asked about the weapons he had relinquished, Scott explained, "I think people are after me." Smith again directed Scott to face the wall, and Scott replied, "I'm paranoid, I can't turn around." Smith told Scott, "You're fine. We are out here to help you." Scott repeatedly responded, "I'm not fine." Although they did not discuss it, officers allege they recognized Scott was in "some sort of distress" and concluded he met the qualifications for a medical hold for his mental health and safety.

Smith and Huntsman approached Scott and grabbed his arms. Scott repeatedly pleaded "please" and "what are you doing" in a distressed voice, while Smith and Huntsman pulled him to the ground. At first, the officers held Scott's arms at his sides while he was lying on his back. In this position, Scott screamed, struggled, and pled with the officers to leave him alone for over two minutes. The officers then eventually rolled Scott onto his stomach, repeatedly ordering Scott to "stop." With Scott on his stomach and with his hands restrained behind his back, Huntsman put his bodyweight on Scott's back and neck for about one to two minutes. At the same time Smith put his weight on Scott's legs, restraining his lower body. Scott's pleas turned increasingly incoherent and breathless as Huntsman applied his bodyweight.

After handcuffing him, the officers attempted to roll Scott on his side, as he continued to incoherently cry out that he wanted to be left alone. When they rolled Scott over, his face was bloody from contact with the ground. Scott stopped yelling and thrashing around after a few minutes. Scott did not respond when Smith and Huntsman tried to wake or revive him. Shortly after, when the paramedics arrived, Scott was still unresponsive. Scott was pronounced dead after paramedics removed him from the scene. Plaintiffs' expert found that Scott had died from restraint asphyxia.

Rochelle Scott (Scott's daughter and co-special administrator of his estate) and Fredrick Waid (co-special administrator of Scott's estate) sued Officer Smith, Officer Huntsman, and the Department. They alleged claims under 42 U.S.C. § 1983 for violation of Scott's Fourth Amendment right to be free from excessive force and Rochelle Scott's Fourteenth Amendment right to familial association, among other claims. Defendants Smith and Huntsman moved for

summary judgment, arguing in part that no constitutional violation occurred and that they were entitled to qualified immunity.

The district court granted in part and denied in part Defendants' motion for summary judgment. Relevant here, the district court denied qualified immunity to Smith and Huntsman on Plaintiffs' Fourth Amendment claim and on Rochelle Scott's Fourteenth Amendment claim. Smith and Huntsman timely appealed.

## JURISDICTION

As a threshold matter, we address our jurisdiction to hear this interlocutory appeal. A denial of summary judgment is not ordinarily appealable because it is not a "final decision." *See* 28 U.S.C. § 1291; *Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022). But we may "review orders denying qualified immunity under the collateral order exception to finality." *Ballou*, 29 F.4th at 421. The scope of our jurisdiction is "circumscribed." *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013). We cannot consider "a *fact*-related dispute" over whether the evidence is "sufficient to show a genuine issue of fact for trial." *Est. of Anderson*, 985 F.3d at 731 (quoting *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018)). But we may decide "whether the defendant would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *George*, 736 F.3d at 836 (quoting *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012)) (cleaned up). In other words, we have jurisdiction when defendants are not asking us "to re-decide the facts, but rather, to reapply the law." *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998).

Smith and Huntsman devote much of their briefing to *their* version of events that Scott disputes. But here, the district court denied the officers' request for qualified immunity because the record presents multiple genuine issues of fact. Those include whether Scott tried to reach for his jacket pocket before falling to the ground, whether Scott voluntarily fell to the ground or was forced to the ground in a takedown maneuver, how long Scott was in a facedown position on the ground, how long Officer Huntsman had his knee on Scott's back and neck, the timing of Scott's handcuffing, and the cause of Scott's death. We must accept these findings unless Plaintiffs' "version of events is 'blatantly contradicted by the record.'" *Orn v. City of Tacoma*, 949 F.3d 1167, 1171 (9th Cir. 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). In short, we cannot credit *Defendants'* version of the facts or "assume that a jury would resolve factual disputes in [*their*] favor." *Id.* Thus, though we lack jurisdiction to redecide factual disputes, we can evaluate whether, assuming each dispute is resolved in favor of Plaintiffs, Defendants are entitled to qualified immunity. Construing the facts in favor of Plaintiffs, we hold that Officers Smith and Huntsman are not entitled to qualified immunity for Plaintiffs' Fourth Amendment claim. We find Smith and Huntsman are entitled to qualified immunity for Rochelle Scott's Fourteenth Amendment claim.

## STANDARD OF REVIEW

We review the grant or denial of summary judgment on the ground of qualified immunity de novo. *Ballou*, 29 F.4th at 421. "Because the reasonableness standard 'nearly always requires a jury to sift through disputed factual contentions . . . summary judgment . . . in excessive force cases should be granted sparingly.'" *Torres v. City of Madera*, 648 F.3d

1119, 1125 (9th Cir. 2011) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

## DISCUSSION

To determine whether Smith and Huntsman are entitled to qualified immunity, we ask two questions. First, viewing the facts in the light most favorable to Plaintiffs, did Smith and Huntsman violate a constitutional right? *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021). And second, if a constitutional right was violated, was it a clearly established right? *Id.* Plaintiffs assert that Smith and Huntsman violated both their Fourth and Fourteenth Amendment rights. For each claim, we answer these questions in turn.

## I.  Fourth Amendment Claim

### A. Smith and Huntsman violated Scott's Fourth Amendment rights.

"Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). To assess the objective reasonableness of an officer's actions, "we consider: (1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Rice*, 989 F.3d at 1121 (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc)) (cleaned up). We must consider the totality of the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Graham v. Connor*, 490 U.S. 386, 396 (1989). After weighing the totality of the circumstances, we find that Officers Smith and Huntsman violated Scott's Fourth Amendment rights.

### i. The type and amount of force used.

First, we hold that Smith and Huntsman used deadly force. To classify the force used, we consider the specific circumstances of the case. *Rice*, 989 F.3d at 1121. "Both the nature and degree of physical contact and the risk of harm and the actual harm experienced are relevant." *Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022) (quoting *Williamson v. City of National City*, 23 F.4th 1146, 1152 (9th Cir. 2022) (cleaned up). Deadly force is force that "creates a substantial risk of causing death or serious bodily injury." *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005).

Huntsman used bodyweight compression on Scott's back and neck during and shortly after handcuffing him. While Smith restrained Scott's lower body, Huntsman kept his bodyweight on Scott's back and neck for about one to two minutes while Scott's pleas turned increasingly incoherent and breathless. Shortly after, Scott lost consciousness. He was declared dead after paramedics removed him from the scene. This was severe, deadly force.

Our precedent establishes that the use of bodyweight compression on a prone individual can cause compression asphyxia. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–57 (9th Cir. 2003). In *Drummond*, for example, officers "press[ed] their weight on [the plaintiff's] neck and torso as he lay handcuffed on the ground." *Id.* at 1056. This force was "severe and, under the circumstances, capable of causing death or serious injury." *Id.* Drawing all

reasonable inferences in Plaintiffs' favor, a jury could find Smith and Huntsman's conduct was similar deadly force. [2]

### ii.  The government's interest in the use of force.

We next evaluate the government's interests by considering the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether a suspect is actively resisting arrest or attempting to escape. *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). "These factors are non-exhaustive, and we examine the totality of the circumstances, including the availability of less intrusive alternatives to the force employed and whether proper warnings were given." *Rice*, 989 F.3d at 1121–22 (citations omitted). The "most important" factor is whether the suspect posed an immediate threat. *Id.* at 1121 (quoting *Isaveya v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017)). "However, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

When weighing these factors, we also take a detainee's mental illness into account. *Drummond*, 343 F.3d at 1058. "The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently

---

[2] This comparison is further bolstered by the fact that *Drummond* used a stricter test than the one we apply today. After *Drummond*, we relaxed our definition of deadly force to encompass force that creates a substantial risk of serious bodily injury, rather than only a substantial risk of death. *See Smith*, 394 F.3d at 705–06.

committed a serious offense." *Id.* (quoting *Deorle*, 272 F.3d at 1282–83). Even if "an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him," the government interest in using such force is limited "by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Id.* (quoting *Deorle*, 272 F.3d at 1283). Thus, although there is no per se rule establishing different classifications of suspects, we have recognized that counseling, where feasible, "may provide the best means of ending a crisis." *Id.* (quoting *Deorle*, 272 F.3d at 1283).

Here, the City's interests were limited. First, Smith and Huntsman did not suspect Scott of a crime. Indeed, Scott called 911 because he feared he was a *victim* of a crime. And officers quickly acknowledged at the scene that he appeared to be suffering from mental illness.

Second, viewing the facts in the light most favorable to Plaintiffs, Scott did not pose a danger to the officers or others. Huntsman and Smith did not receive any warning that Scott was dangerous or that he had threatened himself or others. When Smith and Huntsman arrived on the scene, Scott was alone in his apartment, and did not threaten officers when speaking through the closed door. Nor did he threaten his own life. After officers persuaded Scott to exit his apartment, he still did not threaten officers or himself. Scott stood against a wall as ordered and made no sudden or threatening gestures toward the officers.

Defendants argue that Scott posed a threat because he had two weapons—a pipe and a knife. But at the scene, Scott immediately relinquished both objects when directed to do so, handing the knife to the officers with the handle out. He

explained openly that he was mentally ill and paranoid and asked the officers to put him into their patrol car. Taking the facts in the light most favorable to Scott, a jury could find he posed no threat to the officers. *See Smith*, 394 F.3d at 702 (holding that, though the plaintiff was not completely compliant, "considering the evidence in the light most favorable to him, a rational jury could very well find that he did not, at any time, pose a danger to the officers or others").

Third, whether Scott was "actively resisting arrest" is more complicated. Scott asked Smith and Huntsman not to touch him, and screamed and tried to pull away from the officers after they pulled him to the ground. But degree matters. Scott did not attack the officers or anyone else, nor did he threaten to do so. Instead, he stood where officers directed him to stand and made no threatening movements. *See id.*, 394 F.3d at 703 (finding it significant that the suspect did not attack or threaten officers although he "ignored the officers' requests to remove his hands from his pajamas and to place them on his head").

Finally, construing the facts in favor of Plaintiffs, Smith and Huntsman ignored less intrusive alternatives to the force they employed. Plaintiffs' expert opined that Smith and Huntsman had alternatives to bodyweight force. They could have used verbal de-escalation strategies, waited for the support of additional officers to execute a safer "team takedown," or waited for EMS to execute a "soft restraint." Smith and Huntsman employed none of these alternatives. *See Rice*, 989 F.3d at 1124 ("Although officers 'need not avail themselves of the least intrusive means of responding to an exigent situation,' their failure to consider 'clear, reasonable and less intrusive alternatives' to the force employed 'militates against finding the use of force

reasonable.'" (quoting *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011))).

In sum, because Scott was mentally ill, was not suspected of a crime, and did not present a risk to officers or others, the government's interest in applying force was limited.

### iii.  The balance of interests.

Finally, we must balance the force used against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos*, 287 F.3d at 854). Generally, deadly force is not permissible "unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Smith*, 394 F.3d at 704 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). But even non-deadly force must not to be deployed lightly. *Drummond*, 343 F.3d at 1057. Force "is permissible only when a strong government interest *compels*" the degree of force used. *Id.* (quoting *Deorle*, 272 F.3d at 1280).

We hold that Smith and Huntsman were not justified in using deadly force against Scott, a mentally ill person who was not suspected of committing a crime and presented little or no danger. *See Garner*, 471 U.S. at 8, 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). Indeed, there are genuine issues of fact regarding whether *any* force was necessary. *See, e.g.*, *Young v. County of Los Angeles*, 655 F.3d 1156, 1166 (9th Cir. 2011) (officer was not justified in use of "significant force" against a nonviolent

individual suspected of a misdemeanor). The balance of
interests here is similar to *Drummond*, where officers also
used significant or deadly force on a mentally ill individual
to detain him for a mental health hold. *Drummond*, 343 F.3d
at 1059. Like *Drummond*, an officer pressed his "weight
against [Scott's] torso and neck, crushing him against the
ground." *Id*. And despite his pleas, and a lack of any apparent
danger, they continued to detain him. *Id.* at 1059–60. There,
as here, "grievous injury does not serve [the] objective" of
taking an individual into "custody to prevent injury to
himself" when he is not suspected of any crime. *Id.* at 1059.
Viewing the facts in the light most favorable to Plaintiffs, a
reasonable jury could thus find that the officers' use of
severe or deadly force was constitutionally excessive.

### B. Scott's Fourth Amendment rights were clearly established at the time of the violation.

Because we hold that Smith and Huntsman's actions,
taken in the light most favorable to Plaintiffs, establish a
constitutional violation, we must next consider whether the
law was clearly established, so that a reasonable officer
would know the officers' conduct was unconstitutional.
"Conduct violates a clearly established right if the
unlawfulness of the action in question is apparent in light of
some pre-existing law." *Ballou*, 29 F.4th at 421 (quoting
*Benavidez v. County of San Diego*, 993 F.3d 1134, 1151–52
(9th Cir. 2021) (cleaned up). There need not be a case
"directly on point," but "the constitutional question must be
'beyond debate.'" *Ohlson v. Brady*, 9 F.4th 1156, 1166–67
(9th Cir. 2021) (quoting *Kramer v. Cullinan*, 878 F.3d 1156,
1163 (9th Cir. 2018)).

Our caselaw makes clear that any reasonable officer
should have known that bodyweight force on the back of a

prone, unarmed person who is not suspected of a crime is constitutionally excessive. Long before Scott's death, we clearly established that it is unconstitutional to use bodyweight force on the back and neck of a prone and unarmed individual. *See Drummond*, 343 F.3d at 1059. The law is especially clear where, as here, the officers know the prone individual is suffering from a mental illness and is not suspected of a crime. *Id.* In *Drummond*, officers "pressed their weight against [an individual's] torso and neck, crushing him against the ground." *Id.* They "maintained that pressure for a significant period of time" while the suspect was prone, handcuffed, "offered no resistance," and "repeatedly told the officers that he could not breathe and that they were choking him." *Id.* at 1054, 1063. We found that "[v]iewing the evidence in the light most favorable to [the plaintiff], . . . the officers had 'fair warning' that the force they used was constitutionally excessive even absent a Ninth Circuit case presenting the same set of facts." *Id.* at 1061. Indeed, we needed "no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law." *Id.* at 1062.

The similarities between this case and *Drummond* are striking. Scott was not suspected of a crime. Instead, he was taken into custody because of his mental health. Though they were presented with an individual experiencing a mental health crisis and presenting no obvious danger to others, Smith and Huntsman crushed Scott's back and neck to subdue him while handcuffing him. Scott also cried out with increasing distress and incoherence as the officers' force escalated. Reasonable officers would have known that their

force was not reasonable and that it created a serious risk of asphyxiating Scott.

Defendants argue that *Drummond* does not control because it clearly established that the use of bodyweight force was excessive only on a prone and *already handcuffed* individual. But construing the events in Scott's favor, officers used their bodyweight on Scott while he was restrained with his hands behind his back, which is the functional equivalent of being handcuffed. And more critically, the officers received fair notice that their force was constitutionally excessive despite the timing of the handcuffing. *Drummond* addressed a handcuffed suspect, but as explained above, it also opined more generally about the use of bodyweight force on a prone individual. *See Drummond*, 343 F.3d at 1061–62. Indeed, *Drummond* also addressed a mentally ill and distressed individual who was not suspected of any crime and was being taken into custody only for his own safety. *Id.*

Moreover, as *Drummond* itself demonstrates, a decision with identical facts is not required to clearly establish that it is unreasonable to use deadly force when the force is totally unnecessary to protect officers, the public, or the suspect himself. *See Hope v. Pelzer*, 536 U.S. 730, 740 (2002) (There can be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions g[i]ve reasonable warning that the conduct then at issue violated constitutional rights." (quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997))). Though officers must be fairly on notice that their conduct was unconstitutional, defining the "right allegedly violated" in too much detail allows "officials, and future defendants, to define away all potential claims." *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1158 (9th Cir. 2000) (quoting *Kelley v. Borg*, 60 F.3d 664, 667 (9th

Cir. 1995)) (cleaned up). We have thus repeatedly applied *Drummond* as clearly established law despite some variation in the force presented. *See, e.g.*, *Zelaya v. Las Vegas Metro. Police Dep't*, 682 F. App'x 565, 567 (9th Cir. 2017) (mem.) (holding that although officers used bodyweight force for a period shorter than the officers in *Drummond*, *Drummond* controlled because there was a material issue of fact regarding whether the force was used for a "significant" period); *Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x 627, 629 (9th Cir. 2012) (mem.) (holding that although, unlike *Drummond*, the suspect resisted, *Drummond* still controlled because of the similar use of bodyweight force).[3] We do the same here. *Drummond* clearly established that the officers' use of force was constitutionally excessive.

## II. Fourteenth Amendment Claim

Rochelle Scott alleges that Smith and Huntsman's use of force also violated her Fourteenth Amendment substantive due process rights. We hold that Smith and Huntsman violated Rochelle Scott's constitutional right to familial association, but because that right was not clearly established, Smith and Huntsman are entitled to qualified immunity.

---

[3] Our court's recent decision in *Perez v. City of Fresno*, 98 F.4th 919 (9th Cir. 2024), does not change this analysis. There, we found the officers were entitled to qualified immunity because they were acting at the direction of a paramedic when they applied their bodyweight. *Id.* at 926 ("Given the specific context of this case, we cannot conclude that *Drummond* put the officers on fair notice that their actions—pressing on a backboard on top of a prone individual being restrained for medical transport, *at the direction of a paramedic working to provide medical care*—was unlawful." (emphasis in original)). Smith and Huntsman did not rely on an equivalent intervening decisionmaker here.

**A. Smith and Huntsman violated Rochelle Scott's Fourteenth Amendment rights.**

Parents and children have a substantive due process right to a familial relationship free from unwarranted state interference. *Hardwick v. County of Orange*, 980 F.3d 733, 740–41 & n.9 (9th Cir. 2020). To show a violation of the right to familial association under the Fourteenth Amendment based on an officer's use of force, a plaintiff must establish that an officer's conduct "shocks the conscience." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

Two tests govern whether an officer's conduct "shocks the conscience." *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022). "Which test applies turns on whether the officers had time to deliberate their conduct." *Id.* The "deliberate-indifference test" applies when a situation "evolve[s] in a time frame that permits the officer to deliberate before acting." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). The more demanding "purpose-to-harm test" applies when a situation "'escalate[s] so quickly that the officer must make a snap judgment." *Id.*

To decide which test to apply, we must thus ask whether actual deliberation by the officer was "practical." *Porter*, 546 F.3d at 1137 (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998), *as amended* (Nov. 24, 1998)). But we have recognized that deliberation may be practical even without an extended timeline of events. In *Nicholson*, for example, an officer had time to deliberate when, after seeing a teenager with a toy gun, he jumped out of a car and fired several shots. 935 F.3d at 693–94. The officer's "immediate use of force without

communicating with his partner, his failure to seek cover, and his failure to formulate a plan before acting were" sufficient to create a genuine dispute of fact on whether deliberation was practical. *Id.* at 693. The court thus applied the deliberate indifference test. *Id.*; *cf. Wilkinson*, 610 F.3d at 554 (distinguishing exigent circumstances by applying the purpose-to-harm standard where "[w]ithin a matter of seconds, the situation evolved from a car chase to a situation involving an accelerating vehicle in dangerously close proximity to officers on foot").

We hold that, viewing the facts in the light most favorable to Plaintiff, Smith and Huntsman had time to deliberate. In other words, the encounter was not escalating, and officers had time to consider their next steps. Over seven minutes passed after officers arrived on the scene before they had any physical contact with Scott. Indeed, the officers called their sergeant to ask for guidance before continuing the encounter. And once Scott exited his apartment, he moved slowly, complied with officers' orders, and openly explained that he was suffering from mental illness. These circumstances gave the officers ample time to consider their conduct before acting, and the deliberate indifference standard applies.

Applying the deliberate indifference standard, Smith and Huntsman violated Rochelle Scott's Fourteenth Amendment rights. An officer acts with deliberate indifference by disregarding a known or obvious consequence of their actions. *Nicholson*, 935 F.3d at 693. This "entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (quoting *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013)). In *Nicholson*,

for example, an officer observed a teenager among a group of students in uniforms and with backpacks who appeared to be holding a gun pointed at the ground. 935 F.3d at 693. We held that, because the suspect "was not engaged in any threatening . . . behavior," and was surrounded by other minors, the officer acted with deliberate indifference when he rushed toward the teens and fired his weapon at them as he ran. *Id.*

Taking the facts in the light most favorable to Plaintiff, Smith and Huntsman were deliberately indifferent to the risk that their use of force could seriously injure or kill Scott. Scott presented no immediate risk to the officers before they initiated deadly force. And when officers took Scott to the ground, he cried out in distress over the course of the encounter. After Huntsman put his bodyweight on Scott, Scott's cries were also increasingly muffled and incoherent. A jury could find the use of bodyweight force given these circumstances was deliberate indifference. *Cf. Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (finding when evaluating deliberate indifference in an Eighth Amendment claim that whether an "official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, . . . and a factfinder may conclude that [the] official knew of a substantial risk from the very fact that the risk was obvious").[4] Thus, construing all facts and resolving all disputes in Rochelle Scott's favor, Smith and Huntsman violated her Fourteenth Amendment rights.

---

[4] Defendants appear to acknowledge as much, arguing that they did not engage in "conscience shocking" behavior only by applying the purpose-to-harm standard.

**B. Rochelle Scott's Fourteenth Amendment rights were not clearly established at the time of the violation.**

Even if a constitutional violation occurred, Smith and Huntsman are nevertheless entitled to qualified immunity unless the constitutional right was clearly established at the time of the officers' conduct. *Rice*, 989 F.3d at 1120. Because no analogous case existed at the time of the events here, we hold that the district court erred by denying Defendants qualified immunity for this claim.

We have long recognized that a child's constitutionally protected interest in the companionship of a parent can be violated by an officer's conscience shocking conduct. *See Hayes v. County of San Diego*, 736 F.3d 1223, 1229–30 (9th Cir. 2013). But clearly established law cannot be defined at such a "high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, "[f]or a right to be clearly established, case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). That is not the case here. Although Plaintiff need not identify a factual twin, Plaintiff identifies no authority for finding a Fourteenth Amendment violation here, instead citing only a general statement of the rule.[5] We have not identified any

---

[5] Although the facts underlying the claims may be the same, "Fourth Amendment cases . . . do not clearly establish the contours of . . . Fourteenth Amendment substantive due process rights." *Nicholson*, 935 F.3d at 696 & n.5.

such authority either. Smith and Huntsman are entitled to qualified immunity for this claim.

We thus reverse the district court's summary judgment denying Officers Smith and Huntsman qualified immunity because Rochelle Scott's constitutional right was not clearly established at the time of the violation. But we now clarify that right going forward. *See supra* Section II.A.

## CONCLUSION

We affirm the district court's denial of qualified immunity to Smith and Huntsman as to the Fourth Amendment claim and reverse the court's ruling as to the Fourteenth Amendment claim. We remand for proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.** Each party shall bear its own costs on appeal.